UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

WILLIE UNDERWOOD, III,

                Plaintiff,

                                  Case # 15-CV-684-FPG

v.

                                    DECISION AND ORDER

ROSWELL PARK CANCER INSTITUTE,
JAMES MOHLER *individually and as Chair of
the Department of Urology*, and Does 1-50,

                Defendants.

## INTRODUCTION

Plaintiff Willie Underwood, III, M.D. ("Dr. Underwood") brings this action to remedy alleged racial discrimination and retaliation by his employer, Roswell Park Cancer Institute ("Roswell Park"), his supervisor, James Mohler, M.D. ("Dr. Mohler"), and Does 1-50. In his Amended Complaint, Dr. Underwood seeks relief under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), 42 U.S.C. § 1981 ("section 1981"), 42 U.S.C. § 1983 ("section 1983"), New York Labor Law sections 740 and 741, the common law of contract, and the Federal Health Care Quality Improvement Act, 42 U.S.C. § 11101 *et seq.* ("HCQIA"). ECF No. 10.

Presently before the Court are motions to dismiss filed by Roswell Park and Dr. Mohler pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. ECF Nos. 15, 16. For the reasons stated below, both motions are granted in part and denied in part.

# BACKGROUND[1]

Roswell Park is a public benefit corporation that operates the Roswell Park Cancer Institute, a cancer research and treatment center located in Buffalo, New York.  ECF No. 10, at ¶ 11.  Dr. Underwood, an African American surgeon, has been employed by Roswell Park in the Department of Urology since September 2008.  *Id.* at ¶ 32, 33.  Dr. Mohler, Chair of the Department of Urology, is Dr. Underwood's immediate supervisor.  *Id.* at ¶ 36.  Dr. Mohler reports to the CEO and President of Roswell Park.  *Id.* at ¶ 17.  Does 1-50 "were employed by [Roswell Park] and in such employment capacities, upon information and belief, had the final decision-making authority regarding the complained-of acts against Dr. Underwood, and authorized, participated in and/or ratified the complained-of acts against Dr. Underwood."  *Id.* at ¶ 12.

Dr. Underwood alleges that almost immediately upon being hired by Roswell Park in September 2008, Dr. Mohler expressed a racial bias against him.  *Id.* at ¶ 54.  In particular Dr. Underwood alleges that on several occasions, both in public and private settings and both in the presence of Dr. Underwood and in the presence of others, Dr. Mohler stated that Dr. Underwood's success as a surgeon and a researcher were due entirely to his race and benefits he received through affirmative action.  *Id.* at ¶ 55.  Dr. Mohler referred to Dr. Underwood as "an affirmative action program achievement," a "token Black,"[2] and also used "other such terms with derogatory meanings that are racially discriminatory to disparage Dr. Underwood's credentials, career and reputation."  *Id.* at ¶ 56.

---

[1]    The following allegations are taken from Dr. Underwood's Amended Complaint (ECF No. 10) and are accepted as true for the purpose of evaluating the instant motions to dismiss.

[2]    When Dr. Underwood was hired by Roswell Park, he became the fourth physician-employee—and of those four, the sole African American—in the Department of Urology.  *Id.* at ¶ 37.

In addition, Dr. Underwood alleges that Dr. Mohler demonstrated a racial bias against him by treating him differently than his white colleagues in numerous different ways. Those allegations are summarized below.

## I.    Income Disparity

At Roswell Park, the salary of Dr. Underwood and other physicians is determined by multiple factors outlined in the Plan For The Management Of Clinical Practice Income At Roswell Park Cancer Institute ("Income Plan"). *Id.* at ¶ 78. These factors include, among other things: the amount of fees generated by the physician's clinical practice; the extent and quality of clinical, research, educational and administrative activities; academic and scholarly productivity; and success in obtaining peer-reviewed grants and recognition by the scientific community. *Id.* at ¶¶ 79-80.

Dr. Underwood was assigned the task and responsibility for research projects "focusing on the major factors underlying health disparities among racial minorities and the influence of all social, cultural, biological, behavioral, and neighborhood factors on those disparities." *Id.* at ¶ 63. As a result of research proposals Dr. Underwood submitted on behalf of Roswell Park, Dr. Underwood was awarded two grants totaling $8 million from the National Cancer Institute, which is part of the National Institute of Health ("NIH"). *Id.* at ¶ 64. Roswell Park received and administered these grants, which led to national praise and attention due to the highly competitive nature of the grants. *Id.* at ¶¶ 65-67. Aside from Dr. Mohler, Dr. Underwood is the only Roswell Park urologist to be awarded an NIH grant. *Id.* at ¶ 68. Although Dr. Underwood's salary should have reflected his efforts in acquiring the $8 million NIH grants pursuant to the Income Plan, he never received income-credit for the grants. *Id.* at ¶ 86.

In November 2009 Dr. Mohler reduced Dr. Underwood's access to operative time, patient referrals, and outpatient office hours, which adversely affected the computation of Dr.

Underwood's salary under the Income Plan. *Id.* at ¶ 82. At the same time, Dr. Mohler required that Dr. Underwood's clinical production and earned income parameters remain unchanged. *Id.* Prior to this change, Dr. Mohler never told Dr. Underwood that his performance was deficient or gave Dr. Underwood an opportunity to address any inadequacies so he could resume his former schedule. *Id.* As a result of the reductions in his work assignments, Dr. Underwood received negative evaluations from Dr. Mohler regarding his financial contributions to the Department of Urology. *Id.* at ¶ 85.

Also in November 2009, Roswell Park hired a white surgeon in the Department of Urology. *Id.* at ¶ 87. Although this surgeon had significantly less experience than Dr. Underwood, had no peer-reviewed funding, and had fewer publications than Dr. Underwood, he was compensated at a higher salary. *Id.* at ¶¶ 87-90.

When Dr. Underwood learned of this salary disparity, he asked Dr. Mohler to rectify it by either increasing his salary to reflect his experience, clinic practice income, academic accomplishments, national recognition and contributions to Roswell Park and the Department of Urology, or in the alternative, increasing his salary to equal that of the white surgeon. *Id.* at ¶ 93. Dr. Mohler denied this request, and Dr. Underwood retained counsel to discuss his salary disparity with Dr. Mohler and the Roswell Park administration. *Id.* at ¶¶ 94, 96. Dr. Underwood eventually secured a higher salary, but he was not provided any retroactive pay and still did not receive a salary equal to that of the white surgeon. *Id.* at ¶ 99. Dr. Mohler also did not restore Dr. Underwood's prior access to operative time, patient referrals or outpatient office hours, which further increased the disparity between Dr. Underwood's salary and the white surgeon's salary. Dr. Underwood continues to receive a lower salary than this white surgeon despite Dr. Underwood's peer-reviewed funding, greater number of publications and more extensive clinical experience. *Id.* at ¶ 101.

## II.   Interference with Academic and Research Duties

In October 2010, Dr. Underwood had met all institutional requirements for promotion to the position of Associate Professor. *Id.* at ¶ 103. However, Dr. Mohler delayed Dr. Underwood's promotion—and accompanying pay increase—until April 2011. *Id.* at ¶ 104. Neither Dr. Mohler nor any other Roswell Park representative provided any objective justification for this delay. *Id.* at ¶ 105.

In 2011, NIH scheduled a site visit to Roswell Park to review how the $8 million grants were being used and their impact on local minority communities. *Id.* at ¶ 108. NIH representatives expected Dr. Underwood to be present for the site visit because he was the Principal Investigator on the grants. *Id.* at ¶ 109. However, Dr. Mohler refused to allow Dr. Underwood to be present or to participate in the site visit. *Id.* at ¶ 110. Dr. Underwood was embarrassed by this decision, professionally and personally, and alleges that Dr. Mohler prevented him from participating because of his race and in order to cause harm to his career, reputation, and salary. *Id.* at ¶¶ 110, 112. After the visit, NIH submitted a report in which NIH commented on the fact that Dr. Underwood was not allowed to be present for the site visit and demanded that Dr. Underwood be afforded adequate time to participate in the activities funded by the NIH grants, including future site visits. *Id.* at ¶ 111.

Sometime in March or April 2011, Dr. Mohler instituted a "policy" in which physicians in the Department of Urology were required to make up time spent away from Roswell Park duties, including time spent engaging in academic pursuits and on vacation. *Id.* at ¶ 113. Although this "policy" was referred to as a Urology Department Policy, Dr. Mohler only applied it to Dr. Underwood and not to any of his white colleagues. *Id.* at ¶ 114. This policy negatively affected Dr. Underwood's salary by making it difficult for him to complete his ongoing clinical and research work and hindering his ability to attain grants for future research. *Id.* at ¶ 115.

Because Dr. Underwood, unlike his white colleagues, had no direct control over the scheduling of his office hours or operation time, he had to find make-up time on his own to satisfy the policy.  *Id.* at ¶ 117.  Dr. Underwood informed Dr. Mohler and other superiors at Roswell Park about the difficulty he was experiencing, but the policy remained in effect.  *Id.* at ¶ 116.

### III.    Prostate Database and Kidney Database

In addition to his clinical duties and funded research, Dr. Underwood served as Principal Investigator of two different databases, the Kidney Database and the Prostate Database.  *Id.* at ¶ 57, 61.  Dr. Underwood was responsible for monitoring and managing the information contained in these databases, which included information about surgeries performed at Roswell Park (such as the diagnoses, protocols and procedures used, existence of any complications, and outcomes).  *Id.* at ¶ 58.

On February 28, 2011, Dr. Underwood sent Dr. Mohler and other relevant members of the Roswell Park administration an email outlining certain concerns Dr. Underwood had with the Prostate Database.  *Id.* at ¶ 122.  Specifically, Dr. Underwood was concerned that Dr. Mohler and others at Roswell Park had acquired funding grants based upon representations that the Prostate Database would be used in clinical research, even though the Prostate Database had only been approved for internal quality control and had not been approved by the Institutional Review Board ("IRB")[3] for use in clinical research.  *Id.* at ¶ 123.  Dr. Underwood was also concerned that information about surgery complications was missing.  *Id.* at ¶ 129.  The flawed data "could potentially result in incorrect research, resulting in substantial and specific danger to the public health or safety."  *Id.* at ¶ 210.

---

[3]    IRB approval must be obtained before human data is used in clinical research.  *Id.* at ¶ 123.

Although others expressed similar concerns and agreed that something needed to be done to protect the integrity of the Prostate Database, nothing was done to remedy the situation. *Id.* at ¶ 131. On August 17, 2011, Dr. Underwood resigned from managing the Prostate Database. *Id.*

Although Dr. Underwood was deeply concerned about the accuracy and integrity of the Prostate Database, he did not have those same concerns about the Kidney Database. *See id.* at ¶ 135. Nevertheless, in September 2011, Dr. Mohler removed Dr. Underwood as Principal Investigator of the Kidney Database. *Id.* at ¶ 134. Dr. Underwood did not learn of this change until February 2012, when he was shown a memorandum to Roswell Park staff purporting to be from Dr. Underwood and stating that he was resigning from the Kidney Database and transferring his position to Dr. Schwaab, a white surgeon in the Urology Department. *Id.* at ¶ 138. Dr. Underwood did not write this memorandum, nor did he agree to transfer his position to Dr. Schwaab or anyone else. *Id.* at ¶ 139. Later that year, Dr. Underwood requested access to information in the Kidney Database for use in his research, but Dr. Schwaab denied the request. *Id.* at ¶ 145. Access and use of the Kidney Database is available to Dr. Underwood's white colleagues, but remains unavailable to Dr. Underwood. *Id.* at ¶¶ 146, 150. Without access to the Kidney Database, Dr. Underwood is prevented from conducting and publishing research based on that data. *Id.* at ¶ 147.

When Dr. Underwood questioned the manner of and basis for his removal from the Kidney Database, Roswell Park representatives accused him of verbally abusing a Roswell Park employee. *Id.* at ¶ 151. Dr. Underwood completely denied the allegations and requested an investigation. *Id.* at ¶ 152. Although the Roswell Park Human Resources Department ("HR Department") initially refused to investigate, they eventually reviewed surveillance tapes and spoke to potential witnesses after Dr. Underwood obtained legal counsel. *Id.* at ¶¶ 153-56. The HR Department ultimately concluded that all of the allegations against Dr. Underwood were

false and unsubstantiated.  *Id.* at ¶ 157.  Despite the HR Department's findings, Dr. Underwood was not restored as Principal Investigator of the Kidney Database and is still unable to access that data.  *Id.* at ¶¶ 160-61.

## IV.    Concerns About Patient Care and Reporting Complications

In March 2012, Dr. Underwood had a series of conversations with Roswell Park representatives about his concern that Dr. Mohler and other physicians in the Urology Department were not reporting complications and patient deaths for peer review, as is required. *Id.* at ¶ 163.  When Dr. Underwood stated that he would make a formal complaint about how a particular surgery was handled,[4] he was told by Roswell Park's Vice President of Ethics that "if you file a complaint outside of the institution, it's going to have ramifications not only for the person you file the complaint against, but for you and for the institute.  You have to know that." *Id.* at ¶ 165.  Dr. Underwood understood this as a warning that his career would be jeopardized if he made a formal complaint based upon the concerns he had raised.  *Id.*

In December 2012, Dr. Mohler again reduced Dr. Underwood's outpatient office hours and transferred a portion of his case load to a white surgeon who was new to the Urology Department.  *Id.* at ¶¶ 166-67.  This further disrupted Dr. Underwood's practice, limited his access to work at Roswell Park, and negatively affected his clients by delaying their appointments to see Dr. Underwood.  *Id.* at ¶¶ 166-170.  Dr. Mohler did not interfere with the schedules of any of Dr. Underwood's white colleagues.  *Id.* at ¶ 169.  Although Dr. Underwood repeatedly complained to the Roswell Park administration about these disruptions in his practice, nothing was done to remedy the situation.  *Id.* at ¶¶ 170-72, 178-80.

Also in December 2012, Dr. Mohler directed that Dr. Underwood's office be moved out of the Urology Department to a building located approximately half of a mile away.  *Id.* at ¶ 173.

---

[4]    Dr. Underwood alleges that "by all medical standards" this surgery should not have been performed due to the patient's medical history.  *Id.* at ¶ 164.

Dr. Mohler assigned Dr. Underwood's previous office to a white surgeon new to the Department. *Id.* at ¶ 174. Dr. Underwood was only notified about the relocation 48 hours in advance, and neither Dr. Mohler nor Roswell Park ever provided any reason for the move. *Id.* at ¶ 175. The new office was "uninhabitable" because it was dirty, lacked suitable furniture, and is located in a noisy area that was undergoing construction. *Id.* at ¶ 176. Because he was physically separated from the rest of the Urology Department, including his secretary, this move also hindered Dr. Underwood's ability to communicate with the rest of the Urology Department and manage the logistics of the research he was conducting. *Id.* Dr. Mohler did not similarly isolate any of Dr. Underwood's white colleagues. *Id.* at ¶ 177.

In January 2013, Dr. Underwood learned that Dr. Mohler had created a "deviation from care report form" which he directed fellows to fill out and give to him after any surgical complication. *Id.* at ¶ 181. Dr. Mohler kept these forms in his possession, thereby preventing complications from being reported through the official process. *Id.*

In May 2013, Dr. Underwood met with Roswell Park's CEO, Roswell Park's Vice President of Human Resources, Roswell Park's Medical Director, and Dr. Mohler. *Id.* at ¶ 186. At this meeting, Dr. Underwood called attention to the improper omission of complications data in the Prostate Database and called for an external review of the Urology Department's practices. *Id.* at ¶¶ 186-87. Although Roswell Park's CEO and Medical Director agreed that an external review was in order, Dr. Mohler responded that "I just worry about our national reputation, which is good, in whether this is a wise thing to do…we don't need a bunch of people to look at something and say this is not right." *Id.* at ¶ 188. At this same meeting, Dr. Underwood expressed his opinion that Dr. Mohler was failing to report complications on operations that he performed. *Id.* at ¶ 189. Dr. Underwood also stated that an external review would demonstrate that he was being treated differently than his white colleagues in the Urology Department. *Id.*

Although Roswell Park agreed to conduct a review of all cases in the Urology Department, no review was ever conducted. *Id.*

On June 4, 2013, Dr. Underwood met with Roswell Park Deputy Director Dr. Candace Johnson ("Dr. Johnson"). *Id.* at ¶ 191. Dr. Underwood informed her that Dr. Mohler had lied about his clinical performance. *Id.* The next day, Dr. Underwood forwarded an article to Roswell Park representatives regarding the expected frequency of complications in the operations that Dr. Mohler had been performing. *Id.* at ¶ 190. Dr. Underwood expressed his concern that Dr. Mohler's rate of complications were far higher than set out in the article, but that he had not reported any patient deaths for 2012 or 2013. *Id.*

## V.    Peer Review

In January 2013, unbeknownst to Dr. Underwood, Dr. Mohler initiated a "peer review" of Dr. Underwood's cases. *Id.* at ¶ 182. Dr. Mohler assembled a binder of select cases in which Dr. Underwood allegedly performed poorly and sent the binder to Roswell Park's then-CEO Dr. Donald Trump ("Dr. Trump") and other members of the Roswell Park administration. *Id.* Some of the cases attributed to Dr. Underwood in the binder, including a case in which the patient died, were actually handled by other physicians. *Id.* at ¶ 184.

In the binder, Dr. Mohler also made false and misleading statements about Dr. Underwood's professional conduct. *Id*. For example, Dr. Mohler alleged that Dr. Underwood had instructed the fellows assisting him not to report complications that had occurred with patients; that Dr. Underwood had not reported patient complications himself; that Dr. Underwood had made professional errors of judgment about patient care; and that he had bullied fellows into hiding his mistakes. *Id.* at ¶¶ 184-85. Dr. Underwood alleges that Dr. Mohler knew that the accusations in the binder were false. *Id.* at ¶ 185.

Dr. Underwood did not learn of the review until October 2013, when he was informed that Roswell Park's Medical Staff Executive Committee had formed a subcommittee to review the binder. *Id.* at ¶ 192. After the subcommittee reviewed the cases in the binder, they sent seven cases to a panel of external reviewers with more expertise in the subject matter of the cases. *Id.* at ¶ 192. Rather than send the entire record on each case, however, Roswell Park sent only portions of the case files to the external reviewers. *Id.* The external reviewers were chosen by Dr. Trump and Dr. Mohler. *Id.* at ¶ 194.

Dr. Underwood alleges that the review violated Roswell Park bylaws in several ways. *Id.* at ¶ 193. First, the three-member subcommittee included Roswell Park's Medical Director and its President of Medical Staff. *Id.* Second, Dr. Underwood was not notified that a review was taking place until ten months after it had been initiated by Dr. Mohler. *Id.* Third, the subcommittee did not interview Dr. Underwood or allow him to provide an explanation for the cases included in the binder. *Id.*

Although several white members of the Urology Department had worse clinical morbidities than those in which Dr. Underwood was accused, they were not similarly scrutinized. *Id.* at ¶ 203.

## VI.    Revocation of Staff Privileges

In November 2013, Dr. Mohler refused to renew Dr. Underwood's staff privileges.[5] *Id.* at ¶ 195. Dr. Mohler premised this refusal on the accusations in the binder and on Dr. Underwood's low volume of robotic surgical cases. *Id.* However, during this same time period, Dr. Mohler had approved privileges for a white surgeon in the Urology Department who had a

---

[5]       Staff privileges refer to a physician's ability to practice medicine at a medical facility. *Id.* at ¶ 196. Privileges must be renewed every two years, and a denial or reduction of privileges must be reported to the National Practitioner database and the New York State Board of Medicine. *Id.* A physician who has had privileges denied or reduced must also disclose that fact to any medical establishment where he or she attempts to work in the future. *Id.* Denial or reduction of privileges also makes it difficult for a physician to renew his or her license or obtain a medical license in another state. *Id.*

lower number of robotic surgeries than Dr. Underwood. *Id.* By refusing to renew Dr. Underwood's privileges, Dr. Mohler severely harmed Dr. Underwood's professional reputation and hindered his ability to obtain new employment or advance his career. *Id.* at ¶ 197.

In 2014, Dr. Underwood filed an Internal Code of Conduct Complaint alleging that Dr. Mohler had made false accusations in the peer review binder regarding Dr. Underwood's conduct with staff and fellows. *Id.* at ¶ 198. Dr. Underwood retained counsel, and a former fellow testified in front of Roswell Park's Vice President of Human Resources, Roswell Park's General Counsel, and Roswell Park's Chief Institute Operation Officer. *Id.* at ¶ 200. The fellow unequivocally stated that Dr. Mohler's accusations were false, that Dr. Underwood reported all surgical complications, and that one of the cases in the peer review binder involved an unusual form of leukemia rather than a mistake by Dr. Underwood. *Id.* The fellow also stated that he had witnessed complications in surgeries performed by other members of the Urology Department that were not reported or were reported inaccurately. *Id.*

Although Dr. Underwood's counsel had found other fellows who were willing to testify, the HR Department refused to continue the meeting or permit more testimony. *Id.* at ¶ 201. The HR Department found that Dr. Mohler's accusations were "unsubstantiated" rather than false and refused to take any action against Dr. Mohler. *Id.* at ¶ 202.

In April 2014, Dr. Underwood met with Dr. Trump and Dr. Johnson. *Id.* at ¶ 205. Dr. Underwood again expressed his concern that the Urology Department was not reporting complications, including patient deaths, and called for an outside review of all doctors in the department. *Id.* Dr. Underwood was not the only physician in the Urology Department to voice similar concerns. *See id.* at ¶¶ 128, 209. On June 18, 2014, Dr. Underwood again met with Dr. Trump. *Id.* at ¶ 207. Dr. Underwood told Dr. Trump that Dr. Mohler had been treating him differently because of his race and had made it very difficult for him to effectively care for his

patients. *Id.* Dr. Trump told Dr. Underwood to "hang in there" and that he would get back to him, but never did. *Id.*

## VII. Advanced Training Course

In a letter dated July 24, 2014, Roswell Park's Vice President of Human Resources confirmed that there was no evidence supporting Dr. Mohler's allegations against Dr. Underwood. *Id.* at ¶ 208. Notwithstanding this letter, Roswell Park presented Dr. Underwood with three options: (1) undergo a further review of the subcommittee's findings, which could lead to the revocation of his medical license; (2) accept a curtailment of surgical duties related to renal medical issues; or (3) participate in an advanced training course at the University of Rochester. *Id.* at ¶ 212. Dr. Underwood chose the third option. *Id.* at ¶ 213. As part of the plan, Roswell Park agreed that if Dr. Underwood completed the training with satisfactory reviews, he would return to Roswell Park and be able to work with the same independence he had before Dr. Mohler initiated the peer review. *Id.*

Dr. Underwood observed and performed surgery at the University of Rochester from July 2014 through October 2014. *Id.* at ¶ 215. During that time, he was not allowed to perform his work at Roswell Park and his patients were reassigned to white physicians in the Urology Department. *Id.* Shortly before he began his work at the University of Rochester, Roswell Park sent a letter to the University of Rochester staff in which Roswell Park criticized Dr. Underwood and maligned his clinical abilities. *Id.* at ¶ 214. However, after completing the four-month training period, the University of Rochester gave Dr. Underwood's performance a positive review and reported that they found no deficiencies or problems with his performance or conduct. *Id.* at ¶ 216. The University of Rochester further expressed that it was pleased and impressed with Dr. Underwood's performance and that it would hire him if a position were available. *Id.* Dr. Edward Messing, who had supervised Dr. Underwood at the University of

Rochester, indicated that he found no weaknesses in Dr. Underwood's clinical performance and that there was no reason not to re-credential Dr. Underwood.  *Id.* at ¶ 220.

## VIII.    EEOC Charge

In early October 2014, Dr. Underwood filed a charge of racial discrimination and racially hostile working environment against Roswell Park with the Equal Employment Opportunity Commission ("EEOC") and the New York State Division of Human Rights.  *Id.* at ¶ 217.  The charge was received by the EEOC on October 15, 2014.[6]  *Id.*  According to Dr. Underwood, the EEOC is required to send a copy of that charge or notice of the charge to the charged party (in this case Roswell Park) within ten days of receiving it.  *Id.* at ¶ 218.

On October 22, 2014, Dr. Mohler sent Dr. Underwood an email informing him that he would not be able to perform clinical activities at Roswell Park for the first week after his return from the University of Rochester.  *Id.* at ¶ 219.

## IX.    Leave of Absence from Hospital Work

On November 4, 2014, one day after Dr. Underwood returned to Roswell Park, Dr. Mohler asked Dr. Underwood to meet with him and Roswell Park's Vice President of Human Resources to discuss his schedule.  *Id.* at ¶ 222.  Despite the positive evaluations from the University of Rochester and the agreed-upon plan to allow Dr. Underwood to perform his work independently after completing the training, Dr. Mohler and Roswell Park refused to approve Dr. Underwood's privileges.  *Id.*  Roswell Park's Vice President of Human Resources stated that Dr. Underwood had three options: (1) take eight months off from working at the hospital and perform only research work; (2) take a leave of absence for six months; or (3) accept staff privileges on a temporary basis, but with close supervision by Dr. Mohler.  *Id.*  Feeling coerced,

---

[6]      Upon his request, the EEOC issued Dr. Underwood a Notice of Right to Sue letter on April 30, 2015.  *Id.* at ¶ 226.

Dr. Underwood accepted the first option and took an eight-month leave of absence[7] from working at the hospital.  *Id.* at ¶ 223.

## X.        Removal as Associate Director of Outreach

In late 2014, Dr. Mohler removed Dr. Underwood from his position as Associate Director of Outreach.  *Id.* at ¶ 224.  This position, which Dr. Underwood had held for approximately two years, entailed brokering partnerships with other medical facilities to increase research productivity at Roswell Park.  *Id.*  Dr. Mohler was replaced by a white physician and was not given any notice or explanation of this change.  *Id.*

## XI.       Denial of Access to Data

In June 2015, Dr. Underwood attempted to begin work on an extension of the Community Network Project, for which he had received funding from NIH in 2010.  *Id.* at ¶ 227.  Roswell Park was aware of the project, had signed off on the project during its application, and had accepted funding to conduct the project.  *Id.*  However, Roswell Park interfered with Dr. Underwood's ability to do the research by denying him access to data that was readily available and provided to his white colleagues.  *Id.*  Dr. Underwood alleges that Roswell Park knew that Dr. Underwood would not be able to complete the research without access to this data, and that Roswell Park interfered with the project because "the expected and anticipated results and conclusions of the research would expose a pattern and practice of racial discrimination by Defendants towards African Americans, even as patients."  *Id.*

## XII.      Supervised Privileges

On July 6, 2015, Dr. Mohler wrote a letter to Roswell Park's President of Medical Staff.  *Id.* at ¶ 229.  In the letter, Dr. Mohler recommended that Dr. Underwood only be given "supervised privileges" upon his return to the hospital.  *Id.*  Supervised privileges would not

---

[7]        This leave of absence started on December 10, 2014 and lasted until August 9, 2015.  *Id.* at ¶ 223.

allow Dr. Underwood to operate and carry out his professional duties with the same independence as provided to the other members of the Urology Department, who are white. *Id.* at ¶ 230. The additional scrutiny placed on Dr. Underwood adversely affects his morale and reputation among his peers and medical staff. *Id.*

## LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In reviewing a motion to dismiss under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007), and "draw all reasonable inferences in Plaintiff's favor." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The application of this standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

When deciding a motion under Rule 12(b)(6), a court ordinarily may not rely on matters outside the pleadings unless the court treats the motion as one for summary judgment under Rule 56 and gives the parties a reasonable opportunity to present relevant evidence. Fed. R. Civ. P. 12(d). However, as the Second Circuit explained in *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002):

> For purposes of this rule, "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam) (quoting *Cortec Indus., Inc. v.*

> *Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)); *see* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."). Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint "relies heavily upon its terms and effect," which renders the document "integral" to the complaint. *Int'l Audiotext*, 62 F.3d at 72.

*Id.* at 152-53 (2d Cir. 2002). With respect to documents that are deemed "integral" to the complaint, "it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document" and that "there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). Furthermore, "where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." *Chambers*, 282 F.3d at 153 (quoting *Cortec*, 949 F.2d at 48) (internal quotations omitted).

Here, Roswell Park attached the following documents to its motion to dismiss: a copy of the Charge of Discrimination against Roswell Park filed by Dr. Underwood and received by the EEOC on October 15, 2014 (ECF No. 16-5, at 5-7); a copy of the Notice of Charge of Discrimination sent by the EEOC on December 18, 2014 and received by Roswell Park on December 22, 2014 (ECF No. 16-5, at 2-4); and a copy of the EEOC Notice of Right to Sue letter sent to Dr. Underwood on April 30, 2015 (ECF No. 16-6).

The EEOC Charge of Discrimination and Notice of Right to Sue letter are incorporated by reference into Dr. Underwood's Amended Complaint and will therefore be considered in the context of the instant motions to dismiss. *See* ECF No. 10 at ¶¶ 217-19, 226. The Notice of Charge of Discrimination, however, will not be considered. Dr. Underwood does not reference this document in his Amended Complaint, and its accuracy is not undisputed; although it suggests that Roswell Park received notice of Dr. Underwood's EEOC charge on December 22,

2014, Dr. Underwood alleges that the EEOC notified Roswell Park much earlier—within ten days of receiving the charge on October 15, 2014.  *Id.* at ¶ 218.

## DISCUSSION

Dr. Underwood asserts the following types of claims against Roswell Park, Dr. Mohler, and Does 1-50: discrete discrimination, retaliation, hostile work environment, whistleblower retaliation, and breach of contract.  ECF No. 10.  In their motions to dismiss, Roswell Park and Dr. Mohler raise several arguments challenging the viability of these claims.  ECF Nos. 15, 16.  In addition, both Roswell Park and Dr. Mohler argue that the HCQIA does not provide a private right of action and that all claims against Does 1-50 should be dismissed.  *Id.*  Lastly, Roswell Park argues that it is immune from punitive damages in this case.  ECF No. 16.

## I.   **Discrete Discrimination**

Dr. Underwood seeks relief under Title VII, the NYSHRL, section 1983, and section 1981 for numerous alleged discrete acts of discrimination.  The Court will address Defendants' arguments regarding each statute in turn.

### A.  **Title VII**

Title VII makes it an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2.  As a preliminary matter, Dr. Underwood's Title VII claim is dismissed as to Dr. Mohler because "individuals are not subject to liability under Title VII."  *Sassaman v. Gamache*, 566 F.3d 307, 315-16 (2d Cir. 2009) (quoting *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004)).  Roswell Park argues that many of the allegations set forth in Dr. Underwood's Amended Complaint are either time-barred or were not presented to the EEOC.  ECF No. 16-1, at 9-13.

### i.    Statute of Limitations

As relevant here, a plaintiff alleging discrimination in violation of Title VII must file a charge with the EEOC "within three hundred days after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1).  This statute of limitations "precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002).

Because Dr. Underwood filed his EEOC charge on October 15, 2014, he may only maintain an action with respect to discrete acts of discrimination that happened on or after December 19, 2013.  For example, Dr. Underwood alleges that Roswell Park forced him to undergo a training course at the University of Rochester from July 2014 through October 2014; failed to renew his privileges after he completed the course and forced him to take an eight-month leave of absence from working at the hospital (December 10, 2014 through August 9, 2015); and removed him from his position as Associate Director of Outreach in late 2014.  It is also important to note that although Dr. Underwood alleges that he was paid less than his white colleagues beginning in 2008, he is not precluded from alleging discrete acts of discriminatory pay after December 19, 2013.  *See* 42 U.S.C. § 2000e-5(e)(3)(A).

With respect to alleged discrete acts of discrimination that occurred before December 19, 2013, Dr. Underwood argues that the "continuing violation" doctrine applies.  ECF No. 22, at 4-7; ECF No. 23, at 9-13.  Under that doctrine, if a plaintiff has been subjected to an ongoing policy of discrimination and at least one incident of discrimination occurred within the statutory period, "all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone."  *Chin v. Port Auth. of N.Y. & New Jersey*, 685 F.3d 135, 155-56 (2d Cir. 2012).  However, the Supreme Court in *Morgan* held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.

Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Morgan*, 536 U.S. at 113. Thus, to the extent the continuing violation doctrine is viable at all after *Morgan*, it cannot apply to discrete acts of discrimination. *Chin*, 685 F.3d at 157 (holding that under *Morgan*, discrete acts outside of the statutory period "cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period").

The Court in *Morgan* explained that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Id.* at 114. A claim based solely on the delay of Dr. Underwood's promotion to Associate Professor from October 2010 until April 2011, for example, would be time-barred. With respect to other actions that an employer may take, however, determining whether the action is a discrete "unlawful employment practice" under *Morgan* may depend on the specific nature of that action and other surrounding circumstances. Therefore the Court need not identify, at this early stage of the litigation, the specific allegations before December 19, 2013 that are barred by the statute of limitations.[8]

### ii. Exhaustion

Dr. Underwood's EEOC charge alleges that he was subjected to continuing disparate treatment because of his race and a racially hostile work environment. ECF No. 16-5, at 5-7. Although Dr. Underwood does make some allegations in his Amended Complaint that were not included in his EEOC charge, unexhausted Title VII claims may still be sustained if they are

---

[8]     The Court is also mindful of the fact that even if some of the actions described in Dr. Underwood's Amended Complaint are time-barred, the statute of limitations does not bar him from using those acts "as background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113. Thus, early resolution of all the statute of limitations issues in this case would not have a significant effect on the scope of discovery.

"reasonably related" to the exhausted claims.  *Williams v. N.Y. City Hous. Auth.*, 458 F.3d 67, 70

(2d Cir. 2006).  The court in *Williams* explained:

> [A] claim is considered reasonably related if the conduct complained of would fall
> within the scope of the EEOC investigation which can reasonably be expected to
> grow out of the charge that was made. . . The central question is whether the
> complaint filed with the EEOC gave that agency adequate notice to investigate
> discrimination on both bases.   The "reasonably related" exception to the
> exhaustion requirement is essentially an allowance of loose pleading and is based
> on the recognition that EEOC charges frequently are filled out by employees
> without the benefit of counsel and that their primary purpose is to alert the EEOC
> to the discrimination that a plaintiff claims he [or she] is suffering.

*Id.* (internal citations and quotations omitted).   An unexhausted claim is also "reasonably

related" if it alleges retaliation for filing the EEOC charge or alleges further incidents of

discrimination carried out in the same manner alleged in the EEOC charge.  *Wilson-Richardson

v. Reg'l Transit Serv., Inc.*, 948 F. Supp. 2d 300, 305 (W.D.N.Y. 2013).

Here, the allegations in Dr. Underwood's Amended Complaint that were not included in

his EEOC charge are reasonably related and will not be dismissed on exhaustion grounds.  Dr.

Underwood's EEOC charge includes his most significant allegations of racial discrimination and

racially hostile work environment, *see* ECF No. 16-5, at 5-7, and Roswell Park has not pointed to

any allegations in the Amended Complaint that would not be expected to grow out of that

charge.  ECF No. 16-1, at 9-13.  The Amended Complaint also includes allegations of retaliation

for filing the EEOC charge and allegations of further incidents of discrimination carried out in

the same manner alleged in the EEOC charge.   *See* ECF No. 10.   Therefore, Roswell Park's

motion to dismiss Dr. Underwood's unexhausted claims is denied.

### B.  NYSHRL

The NYSHRL makes it "an unlawful discriminatory practice" for an employer to refuse

to hire, discharge, or otherwise discriminate against an individual with respect to the terms or

conditions of employment because of that individual's race.  N.Y. Exec. Law § 296.  New York

courts examine claims under the NYSHRL "with the same analytical lens as corresponding Title VII-based claims." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007); *see also Fanelli v. N.Y.*, 51 F. Supp. 3d 219, 230 (E.D.N.Y. 2014) ("[t]he same standard is used when analyzing Title VII and NYSHRL claims."). However, unlike Title VII claims, individual liability is potentially available under the NYSHRL. *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003). Claims under the NYSHRL are subject to a three-year statute of limitations. *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997).

Both Roswell Park and Dr. Mohler argue that because Dr. Underwood filed his Amended Complaint on November 18, 2015, he is barred from maintaining a claim under the NYSHRL based on actions that occurred before November 18, 2012. ECF Nos. 15-1, 16-1. Dr. Underwood, on the other hand, maintains that July 28, 2015, the date of his original Complaint, should be used to calculate the statute of limitations period. ECF Nos. 22, 23.

Rule 15(c)(1)(B) of the Federal Rules of Civil Procedure states that an amended pleading relates back to the date of the original pleading when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). For a newly-added claim to relate back under this rule, "the basic claim must have arisen out of the conduct set forth in the original pleading." *ASARCO LLC v. Goodwin*, 756 F.3d 191, 202 (2d Cir. 2014) (quoting *Slayton v. Am. Exp. Co.*, 460 F.3d 215, 228 (2d Cir. 2006)), *cert. denied*, 135 S. Ct. 715 (2014). "The central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading." *Id.*

Dr. Underwood's original Complaint, like the Amended Complaint, alleged racial discrimination by Roswell Park and Dr. Mohler in violation of the NYSHRL. ECF No. 1. The

original Complaint also included substantially the same allegations of adverse actions taken against Dr. Underwood.  *Id.*  Neither Dr. Mohler nor Roswell Park point to any allegation in the Amended Complaint that is missing from the original Complaint.  *See* ECF Nos. 15, 16, 24, 25. Therefore, because Dr. Underwood filed his original Complaint on July 28, 2015, the relevant cut-off date for the purpose of applying the statute of limitations to Dr. Underwood's NYSHRL claims is July 28, 2012.  Dr. Underwood may maintain an action with respect to discrete acts of discrimination that occurred on or after July 28, 2012.[9]

### C.  Section 1983

Section 1983 provides a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983.  To state a claim for employment discrimination under section 1983, "a plaintiff must allege two elements: (1) the violation of a right secured by the Constitution and laws of the United States, and (2) the alleged deprivation was committed by a person acting under color of state law."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) (quoting *Feingold v. N.Y.*, 366 F.3d 138, 159 (2d Cir. 2004)) (internal quotations omitted).

The Equal Protection Clause of the Fourteenth Amendment prohibits states from discriminating against employees on the basis of race.  *Id.* at 87-88.  Once the color of law requirement is met, an equal protection employment discrimination claim under section 1983 is governed by the same standards as a Title VII claim, except that a section 1983 claim can be

---

[9]       Again, the Court declines to identify each allegation in the Amended Complaint prior to July 28, 2012 that amounts to a "discrete act" and is therefore time-barred.  The Court does note, however, that *Morgan* also governs the standard for applying the continuing violation doctrine to NYSHRL claims.  *Bermudez v. City of N.Y.*, 783 F. Supp. 2d 560, 574 (S.D.N.Y. 2011); *Sotomayor v. City of N.Y.*, 862 F. Supp. 2d 226, 250 (E.D.N.Y. 2012), aff'd, 713 F.3d 163 (2d Cir. 2013).

brought against an individual. *Id.* at 88. Public benefit corporations such as Roswell Park are treated as municipal entities for the purpose of liability under section 1983. *McIntyre v. NuHealth--Nassau Univ. Med. Ctr.*, No. 11-CV -3934, 2011 WL 4434227, at *4 (E.D.N.Y. Sept. 19, 2011); *McGrath v. Nassau Health Care Corp.*, 217 F. Supp. 2d 319, 330 (E.D.N.Y. 2002).

### i.   Statute of Limitations

Claims brought under section 1983 in New York are subject to a three-year statute of limitations. *Vega*, 801 F.3d at 79. The considerations set forth in *Morgan* also apply to employment claims under section 1983. *Id.* Roswell Park and Dr. Mohler argue, as they did regarding the Title VII and NYSHRL claims, that Dr. Underwood is barred from maintaining a claim under section 1983 based on actions that occurred before November 18, 2012. ECF Nos. 15-1, 16-1. However, for the same reasons discussed above in the context of the NYSHRL, the Court finds that (1) the relevant cut-off date for the purpose of applying the statute of limitations to Dr. Underwood's section 1983 claims is July 28, 2012; and (2) it would be premature for the Court to identify each allegation prior to July 28, 2012 that amounts to a stand-alone "discrete act" and would therefore be time-barred.

### ii.   Dr. Mohler

Dr. Mohler advances two arguments regarding the discrete discrimination claims against him under section 1983. First, Dr. Mohler points out that because Dr. Underwood is asserting a section 1983 claim against Roswell Park, the claim against Dr. Mohler in his official capacity is redundant. ECF No. 15-1, at 12-14; *see Falkowski v. N. Fork Hous. All., Inc.*, No. 08-CV-2550, 2009 WL 3174029, at *10 (E.D.N.Y. Sept. 30, 2009) ("[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent.") (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)) (internal quotations omitted). Dr. Underwood agrees that "the official capacity claims against Defendant Mohler are

unnecessary." ECF No. 22, at 18. Therefore, Dr. Mohler's motion to dismiss is granted with respect to the claims against him in his official capacity under section 1983.

Second, with respect to the discrete discrimination claims against him in his individual capacity, Dr. Mohler argues that he is entitled to qualified immunity. ECF No. 15-1, at 14-15. The doctrine of qualified immunity shields government employees from suits for damages under section 1983 unless (1) the conduct at issue violated the plaintiff's clearly established constitutional rights and (2) a reasonable person in the defendant's position would have known that he or she was violating those rights. *See, e.g., Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996).

Qualified immunity is an affirmative defense and may be raised in the context of a motion to dismiss under Rule 12(b)(6). *McKenna v. Wright*, 386 F.3d 432, 435 (2d Cir. 2004). That being said, a defendant asserting the defense at this stage "faces a formidable hurdle . . . and is usually not successful." *Bryant v. Steele*, 25 F. Supp. 3d 233, 246 (E.D.N.Y. 2014) (quoting *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 191-92 (2d Cir.2006)) (internal quotations omitted). On a motion to dismiss, "[t]he defense will succeed only where entitlement to qualified immunity can be established based solely on facts appearing on the face of the complaint." *Bryant*, 25 F. Supp. 3d at 246 (quoting *McKenna*, 386 F.3d at 436) (internal quotations and alterations omitted). Given that standard, a motion to dismiss "is a mismatch for immunity and almost always a bad ground of dismissal." *Barnett v. Mount Vernon Police Dep't*, 523 F. App'x 811, 813 (2d Cir. 2013) (quoting *McKenna*, 386 F.3d at 436) (internal quotations omitted).

Dr. Mohler fails to show "on the face of the complaint" that he is entitled to qualified immunity. *See McKenna*, 386 F.3d at 436. Rather, his argument consists of a single statement that "it was reasonable under any standard for Dr. Mohler to investigate and act upon concerns

that [Dr. Underwood] was clinically deficient."  ECF No. 15-1, at 14.  Therefore, Dr. Mohler's motion to dismiss on the basis of qualified immunity is denied.

### iii.    Roswell Park

Roswell Park argues that Dr. Underwood fails to state a claim against it under section 1983 because his allegations "relate only to conduct by Dr. Mohler and not any municipal policymaker."  ECF No. 16-1, at 17-20.

Although municipalities and other local governmental bodies are subject to liability under section 1983, they may only be held liable "for their *own* illegal acts."  *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986) (citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 665-683 (1978)) (emphasis in original).  The Supreme Court has "consistently refused to hold municipalities liable under a theory of *respondeat superior*."  *Bd. Of Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 403 (1997).  Instead, a plaintiff seeking to impose liability on a municipality under section 1983 must "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged.  That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  *Id.* at 404 (emphasis in original).

In this context, it is important to distinguish cases that present difficult questions of fault and causation from those that do not.  Where an action taken or directed by the municipality or its authorized decisionmaker *itself* violates federal law, it is easy to conclude that municipal liability attaches.  *Id.* at 404-405.  Further, "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion).  On the other hand, where the plaintiff alleges that the municipality

has not directly inflicted an injury but nonetheless caused an employee to do so, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Brown*, 520 U.S. at 405.

Here, Dr. Underwood alleges that numerous acts of racial discrimination have been taken against him during his employment at Roswell Park. With respect to the actions allegedly taken directly by Roswell Park, such as forcing Dr. Underwood to undergo an eight-month training program at the University of Rochester and refusing to approve his privileges once he completed that program, municipal liability attaches and Roswell Park's motion to dismiss is denied. *Id.* at 403-408; *Pembaur*, 475 U.S. at 479-485.

Most of the actions described in Dr. Underwood's Amended Complaint, however, were allegedly taken by Dr. Mohler. Dr. Underwood does not allege that Dr. Mohler was the final decisionmaker, but rather that Does 1-50 "had the final decisionmaking authority regarding the complained-of acts against Dr. Underwood." *Id.* at ¶ 17. In his Amended Complaint, Dr. Underwood repeatedly states that Dr. Mohler acted "with the authorization and/or ratification of" Roswell Park and Does 1-50. *See, e.g.*, ECF No. 10 at ¶ 195.

Alone, these conclusory statements are not entitled to the assumption of truth and would be insufficient to support municipal liability. *Iqbal*, 556 U.S. at 678. However, Dr. Underwood does provide factual allegations to support the assertion that Roswell Park authorized or ratified the employment actions that were taken against him. For example, Dr. Underwood alleges that Dr. Mohler reported to the CEO and President of Roswell Park at all relevant times. ECF No. 10, at ¶ 17. Dr. Underwood also alleges that he complained to the Roswell Park administration on many occasions regarding the ways in which Dr. Mohler was disrupting his practice. *See, e.g., id.* at ¶¶ 116, 170-72, 176, 178-180, 189, 198, 204, 207. On at least one of these occasions, during a meeting with Roswell Park CEO Dr. Trump, Dr. Underwood specifically complained

that Dr. Mohler had been treating him differently on the basis of his race.  *Id.* at ¶ 207.  Despite these complaints, Dr. Underwood alleges that Roswell Park did nothing to rectify the situation and thereby affirmed the actions taken by Dr. Mohler.  Because the Court finds that Dr. Underwood has alleged sufficient facts to "nudge[]" his claims against Roswell Park "across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, Roswell Park's motion to dismiss is denied.

### D.  Section 1981

Dr. Underwood's Amended Complaint includes a claim for relief under section 1981, which provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  Defendants Roswell Park and Dr. Mohler argue that Dr. Underwood's claim for relief under section 1981 should be dismissed pursuant to the Supreme Court's ruling in *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989).  In *Jett*, the Supreme Court held that section 1983 "provides the exclusive federal damages remedy for the violation of rights guaranteed by § 1981 when the claim is pressed against a state actor."  *Id.*[10]

Dr. Underwood responds to this argument by stating that he "will address this issue in his proposed Second Amended Complaint by re-pleading the Section 1981 claims against Defendant Mohler,[11] consistent with the holding in *Jett*, through Section 1983."  ECF No. 22, at 20.  Because Dr. Underwood has not filed a Second Amended Complaint, the Court interprets this

---

[10]     Section 1981 was amended as part of the Civil Rights Act of 1991 to include subsection (c), which provides that "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."  42 U.S.C. § 1981(c).  The Second Circuit has not decided whether subsection (c) statutorily overrules *Jett* and creates a private right of action against state actors under section 1981.  *See Anderson v. Conboy*, 156 F.3d 167, 169 n.19 (2d Cir. 1998); *Howard v. City of N.Y.*, 602 F. App'x 545, 546 n.1 (2d Cir. 2015).

[11]     In response to Roswell Park's motion to dismiss, Dr. Underwood states that he "adopts [the] arguments and authorities made in Plaintiff[']s Response in Opposition to Defendant Mohler's Motion to Dismiss."  ECF No. 23, at 14.

statement to mean that Dr. Underwood no longer wishes to pursue an independent claim for relief under section 1981, and instead will seek relief under section 1983 for the alleged violation of his rights under section 1981. Therefore, the motions to dismiss Dr. Underwood's claim for relief under section 1981 are granted.

## II.   Retaliation

In addition to his discrete discrimination claims, Dr. Underwood seeks relief under Title VII and the NYSHRL for alleged retaliation he suffered while working at Roswell Park. ECF No. 10, at 95-98. Dr. Mohler argues that Dr. Underwood fails to state a claim for retaliation under the NYSHRL.[12] The Court disagrees.

The NYSHRL makes it an unlawful discriminatory practice for an employer to "retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article." N.Y. Exec. Law § 296(7). For a retaliation claim under the NYSHRL to survive a motion to dismiss, the plaintiff "must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against him, (2) 'because' he has opposed any unlawful employment practice." *Vega*, 801 F.3d at 90.[13]

Here, Dr. Underwood alleges that after he filed a charge of racial discrimination with the EEOC on October 15, 2014, he was retaliated against in several different ways: (1) on November 4, 2014, after Dr. Underwood had returned from his training program at the University of Rochester with positive performance reviews, Dr. Mohler and Roswell Park forced Dr. Underwood to take an eight-month leave of absence from working at the hospital; (2) in late 2014, Dr. Mohler removed Dr. Underwood from his position as Associate Director of Outreach

---

[12]     Other relevant arguments by Dr. Mohler and Roswell Park are discussed above in the previous section of this decision.

[13]     Although the court in *Vega* provided the pleading standards for retaliation claims under Title VII, the same standards are used for claims under the NYSHRL. *Cooper v. N.Y. State Dep't of Labor*, 819 F.3d 678, 681 n.3 (2d Cir. 2016) (quoting *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 316 n. 2 (2d Cir.1999)).

and replaced him with a white physician without any notice or explanation for the reason behind this change; (3) in June 2015, Roswell Park interfered with Dr. Underwood's ability to work on his Community Network Project, a project that could have exposed a pattern of racial discrimination at Roswell Park towards African American patients, by denying him access to data that was readily available to his white colleagues; and (4) on July 6, 2015, Dr. Mohler recommended that Dr. Underwood only be given "supervised privileges" after his leave of absence.

Dr. Mohler characterizes the refusal to renew Dr. Underwood's privileges after he completed his training program at the University of Rochester as merely the continuation of a decision that was taken in November 2013, well before Dr. Underwood filed his EEOC charge. ECF No. 15-1, at 12.  But Dr. Underwood specifically alleges that when Roswell Park first refused to renew his privileges, he was told that he would be able to return to the hospital with independence once he completed his training with satisfactory reviews.  ECF No. 10, at ¶ 213. At this stage of the litigation,[14] where the Court must draw all reasonable inferences in Dr. Underwood's favor, the decision to force Dr. Underwood into another leave of absence after he filed his EEOC charge must be viewed as a separate adverse employment action.

Because Dr. Underwood's allegations are sufficient to state a claim for retaliation under the NYSHRL, Dr. Mohler's motion to dismiss is denied.

## III.   Hostile Work Environment

---

[14]     Dr. Mohler cites two cases, *Gentile v. Potter*, 509 F. Supp. 2d 221, 240 (E.D.N.Y. 2007) and *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001), in support of his argument that Dr. Underwood has failed to state a claim for retaliation under the NYSHRL.  However, both of those cases involve the application of the *McDonnell Douglas* standard of proof in the context of a motion for summary judgment.  Here, at the pleadings stage of the litigation, Dr. Underwood "was not required to plead a *prima facie* case of discrimination as contemplated by the *McDonnell Douglas* framework."  *Vega*, 801 F.3d at 84.

Dr. Mohler and Roswell Park argue that Dr. Underwood fails to state a claim for hostile work environment.[15]  ECF Nos. 15-1, at 9-11; 16-1, at 15-16.  The Court disagrees.

Hostile work environment claims derive from the recognition that a prohibition on workplace discrimination includes not only "economic" or "tangible" discrimination, but also includes "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  As the Supreme Court explained in *Morgan*, "[h]ostile environment claims are different in kind from discrete acts.  Their very nature involves repeated conduct." *Morgan*, 536 U.S. at 115.  While a discrete discrimination claim arises out of a specific employment decision that is actionable on its own, hostile work environment claims "are based on the cumulative effect of individual acts." *Id.*[16]

To state a claim for a racially hostile work environment, a plaintiff must plead facts that would tend to show (1) that the complained-of conduct is objectively severe or pervasive, such that it creates an environment that a reasonable person would find hostile or abusive; (2) that the plaintiff subjectively perceived the environment to be hostile or abusive; and (3) that the complained-of conduct created such an environment because of the plaintiff's race.  *Goins v. Bridgeport Hosp.*, 555 F. App'x 70, 71-72 (2d Cir. 2014) (citing *Patane*, 508 F.3d at 113).  With respect to the first prong, the Supreme Court in *Harris* provided the following elucidation:

> [W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances.  These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.  The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm,

---

[15]     Claims of hostile work environment under Title VII, the NYSHRL, and section 1983 are governed by essentially the same standard, and will therefore be discussed together.  *See, e.g.*, *Patane*, 508 F.3d at 113-15; *Sotomayor*, 862 F. Supp. 2d at 260-61.

[16]     For that reason, hostile work environment claims are treated differently from discrete discrimination claims for the purpose of calculating the statute of limitations.  *Id.* at 117 ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.").

like any other relevant factor, may be taken into account, no single factor is required.

*Harris*, 510 U.S. at 23.

Here, Dr. Underwood has plausibly alleged that he was subjected to a racially hostile work environment at Roswell Park.   In particular, Dr. Underwood makes the following allegations: (1) on several occasions, both in public and private settings and both in the presence of Dr. Underwood and in the presence of others, Dr. Mohler referred to Dr. Underwood as "an affirmative action program achievement" and a "token Black"; (2) Dr. Underwood was not given income credit for acquiring $8 million in NIH grants on behalf of Roswell Park, even though he was entitled to such credit under the Income Plan; (3) in November 2009, Dr. Mohler reduced Dr. Underwood's access to operative time, patient referrals and outpatient office hours; (4) beginning in November 2009, Dr. Underwood received a lower salary than a white surgeon with less experience, less peer-reviewed funding, and fewer publications; (5) Dr. Mohler delayed Dr. Underwood's promotion to Associate Professor from October 2010 until April 2011; (6) in 2011, when NIH scheduled a site visit to review the progress on the $8 million grants, Dr. Mohler refused to allow Dr. Underwood to be present or participate; (7) sometime in March or April 2011, Dr. Mohler instituted a "policy" in which physicians in the Urology Department were required to make up time spent on vacation or engaging in academic pursuits, but only applied this policy to Dr. Underwood and not to any of his white colleagues; (8) in September 2011, Dr. Mohler removed Dr. Underwood as Principal Investigator of the Kidney Database and replaced him with a white surgeon; (9) Roswell Park falsely accused Dr. Underwood of verbal abuse after he questioned the basis for his removal from the Kidney Database; (10) in December 2012, Dr. Mohler further reduced Dr. Underwood's outpatient office hours and transferred a portion of his case load to a white surgeon who was new to the Urology Department; (11) also in December 2012, Dr. Mohler moved Dr. Underwood's office out of the Urology Department to a building

located approximately half a mile away, without giving any reasons for this move, and assigned Dr. Underwood's previous office to a white surgeon new to the Urology Department; (12) Dr. Mohler initiated a "peer review" of Dr. Underwood's performance and accused him of malpractice, even though several white members of the Urology had worse clinical morbidities than him; (13) beginning in November 2013, Dr. Mohler refused to renew Dr. Underwood's staff privileges, which severely harmed his professional reputation and hindered his ability to make career advancements; (14) Roswell Park forced Dr. Underwood to participate in an advanced training course at the University of Rochester from July 2014 through October 2014; (15) after he completed the training course with satisfactory reviews, Roswell Park still refused to approve Dr. Underwood's privileges and forced him to take another eight-month leave of absence from hospital duties; (16) in late 2014, Dr. Mohler removed Dr. Underwood from his position as Associate Director of Outreach and replaced him with a white physician without any notice of or explanation for this change; (17) in June 2015, Roswell Park interfered with Dr. Underwood's ability to perform research by denying him access to data that was readily available to his white colleagues; and (18) on July 6, 2015, Dr. Mohler recommended that Dr. Underwood only be given "supervised privileges" upon his return to the hospital.

Dr. Mohler and Roswell Park argue that in the context of a hostile work environment claim, the Court should disregard all allegations that could be classified as discrete acts of discrimination and should instead focus solely on allegations of insults, slurs, and offensive comments. ECF No. 15-1, at 9-11; ECF No. 16-1, at 15-16. But while the Court recognizes that hostile work environment claims "tend to involve personal attacks and harassing comments directed at the plaintiff," *Parekh v. Swissport Cargo Servs., Inc.*, No. CV-08-1994, 2009 WL 290465, at *5 (E.D.N.Y. Feb. 5, 2009), the scope of hostile work environment claims need not be limited to only those types of allegations. Rather, the focus should be on any allegations that

could plausibly contribute to the wrong that hostile work environment claims are designed to remedy; namely, "requiring people to work in a discriminatorily hostile or abusive environment." *Harris*, 510 U.S. at 21.   To disregard such allegations solely because they *also* could be actionable on their own as discrete acts of discrimination would run afoul of the principle that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at *all* the circumstances" and "no single factor is required." *Id.* at 23 (emphasis added).   Drawing all reasonable inferences in Dr. Underwood's favor, as the Court must do at this stage of the litigation, Dr. Underwood has sufficiently alleged that he was subjected to a racially hostile work environment at Roswell Park.   Therefore, the motions to dismiss by Dr. Mohler and Roswell Park are denied.

## IV.  Whistleblower Retaliation

Dr. Underwood alleges whistleblower retaliation in violation of New York Labor Law sections 740 and 741.   ECF No. 10.   Specifically, Dr. Underwood alleges that he was subjected to retaliation after he complained to his superiors at Roswell Park about the integrity of information in the Prostate Database, the disruption in his practice caused by Dr. Mohler's interference with his schedule, and a pattern within the Urology Department of failing to report complications and patient deaths for peer review. *Id.*

In their motions to dismiss, Dr. Mohler and Roswell Park argue that many of Dr. Underwood's allegations fall outside of the statute of limitations and that he fails to state a claim under either section.   ECF No. 15-1, at 16-22; ECF No. 16-1, at 20-23.

### A.  Section 740

Section 740, as relevant here, prohibits any employer from taking a retaliatory personnel action against an employee because the employee "discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation

of law . . . which violation creates and presents a substantial and specific danger to the public health or safety." N.Y. Lab. Law § 740(2)(a). Claims under section 740 must be commenced "within one year after the alleged retaliatory personnel action was taken." N.Y. Lab. Law § 740(4)(a). Because Dr. Underwood filed his original Complaint on July 28, 2015, the relevant cut-off date for the purpose of his section 740 claim is July 28, 2014.[17]

With respect to his complaints regarding the integrity of the Prostate Database and the disruptions in his clinical practice, Dr. Underwood fails to state a claim for whistleblower retaliation under section 740. In his Amended Complaint, Dr. Underwood does not plausibly allege that the management of the Prostate Database or the disruptions in his schedule created "a substantial and specific danger to the public health or safety." N.Y. Lab. Law § 740(2)(a). The repeated assertion that mismanagement of the Prostate Database "could" result in a substantial and specific danger to public health or safety, *see, e.g.*, ECF No. 10 at ¶¶ 123, 129, 130, 210, is speculative, conclusory, and not entitled to the assumption of truth in the context of a motion to dismiss. *Iqbal*, 556 U.S. at 678. Similarly, Dr. Underwood alleges that disruptions in his practice were inconvenient for himself and his patients but does not plausibly allege the existence of a danger to public health or safety that was "substantial and specific." *See, e.g.*, ECF No. 10, at ¶¶ 168-172.

However, Dr. Underwood does state a claim under section 740 with respect to his complaint that physicians in the Urology Department were failing to report complications and patient deaths. Presumably, the reason for requiring peer review after surgical complications is the fact that such a review prevents similar errors and deaths from happening in the future. Indeed, Dr. Underwood describes in his Amended Complaint an incident in which a patient died

---

[17]    Dr. Underwood's original Complaint, like his Amended Complaint, alleged whistleblower retaliation in violation of sections 740 and 741. Neither Dr. Mohler nor Roswell Park point to any allegation in the Amended Complaint that is missing from the original Complaint. *See* ECF Nos. 15, 16, 24, 25. Accordingly, the Court finds that the whistleblower retaliation claims in Dr. Underwood's Amended Complaint relate back to the time of his original Complaint. Fed. R. Civ. P. 15(c)(1)(B).

after a surgery that, "by all medical standards," should not have been performed.  *Id.* at ¶ 164.

Drawing all reasonable inferences in Dr. Underwood's favor, the alleged pattern within the

Urology Department of failing to report complications and patient deaths created a substantial

and specific danger to public health.  *See Webb-Weber v. Cmty. Action for Human Servs., Inc.*,

23 N.Y.3d 448, 453 (2014); *Rodgers v. Lenox Hill Hosp.*, 211 A.D.2d 248, 253 (1st Dep't 1995);

*Finkelstein v. Cornell Univ. Med. Coll.*, 269 A.D.2d 114, 116 (1st Dep't 2000).

Dr. Underwood has also plausibly alleged a causal connection between his complaints

about the failure to report surgical complications and the adverse employment actions that were

taken against him after July 28, 2014.  In 2012, when Dr. Underwood told Roswell Park's Vice

President of Ethics that he planned to make a formal complaint about how a specific surgery was

handled, the Vice President of Ethics told him that he would personally suffer "ramifications" if

he did so.  ECF No. 10, at ¶ 165.  Dr. Underwood continued to complain about the failure to

report complications and patient deaths in 2013 and 2014.  *See id.* at ¶¶ 186-89 (May 2013), 190-

91 (June 2013), 205 (April 2014), 207 (June 2014).  In July 2014, Dr. Underwood was allegedly

forced to undergo a four-month training course at the University of Rochester, and when he

returned with positive performance reviews he was forced to take another eight-month leave of

absence from the hospital.  *Id.* at 222-23.  Drawing all reasonable inferences in Dr. Underwood's

favor, these facts are sufficient to plausibly suggest that the adverse employment actions he

suffered after July 28, 2014 were taken because of his repeated complaints about the Urology

Department's failure to report complications and patient deaths.

## B.  Section 741

Section 741, New York's health care whistleblower retaliation statute, protects

employees who perform health care services for certain types of employers.  N.Y. Lab. Law §

741(1)(a)-(b).  As relevant here, section 741 prohibits employers from taking retaliatory action

against an employee because the employee "discloses or threatens to disclose to a supervisor, or to a public body an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care."  N.Y. Lab. Law § 741(2)(a).  The term "improper quality of patient care" is defined to mean "any practice . . . which violates any law . . . where such violation relates to matters which may present a substantial and specific danger to public health or safety or a significant threat to the health of a specific patient."  N.Y. Lab. Law § 741(1)(d).  Claims under section 741 must be commenced "within two years after the alleged retaliatory personnel action was taken."  N.Y. Lab. Law §§ 741(4), 740(4)(d).  Accordingly, the relevant cut-off date for the purpose of Dr. Underwood's section 741 claim is July 28, 2013.

Again, the Court finds that Dr. Underwood states a claim for retaliation with respect to his complaints about the failure to report complications and patient deaths, but not with respect to his complaints about mismanagement of the Prostate Database or the disruptions in his schedule.  Although the standard under section 741 is lower than the standard under 740 because a plaintiff need only allege a good faith, reasonable belief that the employer's actions constitute "improper quality of patient care," the term "improper quality of patient care" is defined to require a "substantial and specific danger to public health or safety or a significant threat to the health of a specific patient."  N.Y. Lab. Law § 741; *Minogue v. Good Samaritan Hosp.*, 100 A.D.3d 64, 69-70 (2d Dep't 2012).  In other words, to state a claim under section 741 a plaintiff must still plausibly allege a good faith, reasonable belief that the employer's actions actually created a substantial and specific danger to public health or safety or a significant threat to the health of a specific patient.  With respect to complaints about mismanagement of the Prostate Database and the disruptions in his schedule, Dr. Underwood's Amended Complaint falls short of that standard.  *See, e.g.*, ECF No. 10, at ¶ 205 (alleging that "Dr. Underwood repeatedly

voiced his concern over the quality of information in the database, which could *potentially* result in incorrect research, resulting in substantial and specific danger to the public health or safety") (emphasis added).

In sum, the Court finds that Dr. Underwood states a claim for whistleblower retaliation under New York Labor Law sections 740 and 741.  However, such claims must be limited to alleged retaliation in response to Dr. Underwood's complaints about the Urology Department's failure to report surgical complications and patient deaths.  Further, such claims must be limited to alleged retaliatory actions that were taken within the relevant statutory period.

## V.   **Breach of Contract**

Dr. Mohler and Roswell Park argue that Dr. Underwood fails to state a claim for breach of contract.  The Court agrees.

In *Mason v. Cent. Suffolk Hosp.*, 3 N.Y.3d 343 (2004), the New York Court of Appeals held that "no action for damages may be based on a violation of medical staff bylaws, unless clear language in the bylaws creates a right to that relief."  *Id.* at 346.  The Court of Appeals reasoned that in general, "[i]t is preferable for hospital administrators who decide whether to grant or deny staff privileges to make those decisions free from the threat of a damages action against the hospital."  *Id.* at 348.  That being said, the Court of Appeals also acknowledged that "[a] clearly written contract, granting privileges to a doctor for a fixed period of time, and agreeing not to withdraw those privileges except for specified cause, will be enforced."  *Id.* at 348-49.

Here, Dr. Underwood seeks money damages based on the violation of Roswell Park bylaws during the peer review process that led to his staff privileges being revoked.  ECF No. 10, at ¶¶ 294-314.  But although Dr. Underwood alleges that the peer review process violated

Roswell Park's bylaws in several ways, ECF No. 10, at ¶ 311, he does not allege that "clear language in the bylaws" creates a right to money damages. *Mason*, 3 N.Y.3d at 346.

Dr. Underwood cites *Kaufman v. Columbia Mem'l Hosp.*, 2 F. Supp. 3d 265, 281 (N.D.N.Y. 2014) in response to Defendants' motions to dismiss. ECF No. 22, at 26-27. In *Kaufman*, the plaintiff showed that his employment agreement with the hospital "explicitly incorporates the Medical Staff By-Laws by reference." *Kaufman*, 2 F. Supp. 3d at 281. Here, by contrast, Dr. Underwood does not allege that his employment agreement with Roswell Park explicitly stated that his privileges would only be revoked in accordance with Roswell Park by-laws. *See* ECF No. 10, at ¶¶ 294-314. Therefore, Dr. Underwood's allegations are insufficient to state a claim for breach of contract.

## VI.   Health Care Quality Improvement Act

Dr. Mohler and Roswell Park argue that Dr. Underwood's purported claims under the HCQIA should be dismissed because the HCQIA does not provide a private right of action. ECF No. 15-1, at 24; ECF No. 16-1, at 25. In response, Dr. Underwood states that his "proposed Second Amended Complaint makes [Defendants'] point moot." ECF No. 22, at 29. Because no Second Amended Complaint exists on the Court's docket, and Dr. Underwood has not filed a motion to amend his Amended Complaint, the Court interprets this statement to mean that Dr. Underwood no longer wishes to pursue a claim for relief under the HCQIA.

## VII.   Claims Against Does 1-50

Dr. Mohler and Roswell Park argue that Dr. Underwood's claims against "Does 1-50" should be dismissed. ECF No. 15-1, at 24-25; ECF No. 16-1, at 2-5. In response, Dr. Underwood states that his "proposed Second Amended Complaint makes [Defendants'] point moot." ECF No. 22, at 29. Because no Second Amended Complaint exists on the Court's docket, and Dr. Underwood has not filed a motion to amend his Amended Complaint, the Court

interprets this statement to mean that Dr. Underwood no longer wishes to pursue any claims against Does 1-50.

## VIII.    <u>Punitive Damages Against Roswell Park</u>

Finally, Roswell Park argues that it is immune from punitive damages because it is a public benefit corporation heavily supported by tax dollars and performing an essential governmental function.  ECF No. 16-1, at 5-8.  Dr. Underwood does not contest that Roswell Park should be treated as a municipality or that it is immune from punitive damages in state law claims under *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 386 (1987), but rather asserts—without elaboration—that he may still recover punitive damages against Roswell Park under federal law.  ECF No. 23, at 2.  Dr. Underwood's argument is unavailing because the federal statutes under which he seeks relief, namely Title VII and section 1983, do not permit the award of punitive damages against a municipality.  *Brown v. Baldwin Union Free Sch. Dist.*, 603 F. Supp. 2d 509, 518-19 (E.D.N.Y. 2009) (citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981)); *see also* 42 U.S.C. § 1981a(b)(1).   Therefore, Dr. Underwood is precluded from recovering punitive damages against Roswell Park.

## CONCLUSION

For the reasons stated above, the motions to dismiss filed by Dr. Mohler (ECF No. 15) and Roswell Park (ECF No. 16) are GRANTED IN PART AND DENIED IN PART.

Specifically, the motions are GRANTED with respect to:

- Claims against Dr. Mohler under Title VII;

- Discrete discrimination and retaliation claims against Roswell Park under Title VII regarding acts that occurred before December 19, 2013;

- Discrete discrimination and retaliation claims under the NYSHRL regarding acts that occurred before July 28, 2012;

- Discrete discrimination claims under section 1983 regarding acts that occurred before July 28, 2012;

- Claims under section 1983 against Dr. Mohler in his official capacity;

- Claims seeking independent relief under section 1981;

- Claims under New York Labor Law § 740 regarding acts of retaliation that occurred before July 28, 2014;

- Claims under New York Labor Law § 741 regarding acts of retaliation that occurred before July 28, 2013;

- Whistleblower retaliation claims regarding Dr. Underwood's complaints about mismanagement of the Prostate Database and disruptions in his clinical schedule;

- The breach of contract claim against Dr. Mohler and Roswell Park;

- Claims seeking relief under the HCQIA;

- Claims against Does 1-50; and

- Dr. Underwood's request for punitive damages against Roswell Park.

The motions are DENIED in all other respects.

IT IS SO ORDERED.

Dated: January 13, 2017
     Rochester, New York

_____

HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court